Kendrick Moxon (SBN 128240)
LAW OFFICE OF KENDRICK L. MOXON
3500 West Olive Ave., Ste. 300
Burbank, CA 91505
Tel : (818) 827-7104
Fax : (818) 827-7114
*Attorney for Plaintiffs*

Peter A. Arhangelsky (SBN 291325)
EMORD & ASSOCIATES, P.C.
2730 S. Val Vista Dr.
Building 6, Suite 133
Gilbert, AZ 85295
Em:  parhangelsky@emord.com
Ph:  (602) 388-8899
*Attorney for Plaintiffs*

Jonathan W. Emord (*pro hac vice forthcoming*)
EMORD & ASSOCIATES, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
Em:  jemord@emord.com
Ph:  (202) 466-6937
*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATZE AKKERMAN, an individual residing in Camarillo, CA 93010 | |
| EVELYN SCOGIN, an individual residing in Austin, TX 78741 | Civil Action No. _____ |
| DIANNA LOPER POSTHAUER, an individual residing in Houston, TX 77084 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF RE:** |
| GARY SIMONE, an individual residing in Anbury, CT 06810 | **(1) VIOLATION OF 5 U.S.C. § 553(b)(3) (NOTICE AND COMMENT RULEMAKING);** |
| RACHEL SMALL, an individual | **(2) VIOLATION OF 5 U.S.C. § 706** |

1

residing in Sewell, NJ 08080

TONY BUONFIGLIO, an individual
residing in Margate, FL 33068

                    Plaintiffs,

      vs.

UNITED STATES OF AMERICA
c/o Attorney General of the United
States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001;

U.S. FOOD AND DRUG
ADMINISTRATION,
10903 New Hampshire Avenue, Silver
Spring, MD 20993; and

ROBERT M. CALIFF
Commissioner of the
U.S. Food and Drug Administration,
10903 New Hampshire Avenue, Silver
Spring, MD 20993,

                    Defendants.

**(ARBITRARY AND
CAPRICIOUS FAILURE TO
CONSIDER EVIDENCE);**

**(3) VIOLATION OF 5 U.S.C. § 706
(ARBITRARY AND
CAPRICIOUS AGENCY
ACTION);**

**(4) VIOLATION OF 5 U.S.C. § 706
(ARBITRARY AND
CAPRICIOUS LABELING
REQUIREMENT);**

**(5) VIOLATION OF 5 U.S.C. § 706
(ARBITRARY AND
CAPRICIOUS FINDINGS RE
SPECIAL CONTROLS); AND**

**(6) VIOLATION OF 5 U.S.C. § 706
(ARBITRARY AND
CAPRICIOUS FAILURE TO
CONSULT CLASSIFICATION
PANEL)**

## **COMPLAINT FOR INJUNCTIVE RELIEF**

## I.   **INTRODUCTION**

1.    Plaintiffs Atze Akkerman, Evelyn Scogin, Dianna Loper Posthauer, Rachel Small, Gary Simone, and Tony Buonfiglio (collectively "Plaintiffs"), by counsel, hereby submit this Complaint against Defendants Robert M. Califf, Commissioner, United States Food and Drug Administration (in his official capacity); the United States Food and Drug Administration ("FDA"); and the United States of America.

2

2.     The Plaintiffs bring this action to challenge the FDA's denial of a citizen petition seeking an agency ban on ECT devices.  *See* Dkt. No. FDA-2016-P-2559-0001 (Exh. 1; "Citizen Petition").  The FDA denied the petition in 2018, and instead issued a Final Order "reclassifying" electroconvulsive therapy ("ECT," commonly known as "shock therapy" or "shock treatment") into Class II (Moderate Risk medical device) from Class III (High Risk medical device) for the purpose of treating catatonia or severe major depressive episode ("MDE") associated with major depressive disorder ("MDD") or bipolar disorder ("BPD") in patients age 13 and older who are treatment-resistant or require a rapid medical response due to the severity of their psychiatric or medical condition.  *See Neurological Devices; Reclassification of Electroconvulsive Therapy Devices; Effective Date of Requirement for Premarket Approval for Electroconvulsive Therapy Devices for Certain Specified Intended Uses*, *Final Order*, 83 Fed. Reg. 66103-66124 (Dec. 18, 2018) (the "Final Order").

3.     FDA's decision to reclassify ECT into "Class II" has made ECT more available in the market.

4.     ECT is inherently dangerous, involving imparting an unrestricted electrical current of 100 Joules, consisting of up to 460 volts of electricity, directly into and through the human brain in a current passing from temple to temple or from the top of the head to one temple.  The stated purpose is to induce a grand mal seizure.  Members of the medical community have described ECT as "barbaric."  *See* FDA-2014-N-1210-3471.  It causes brain damage, general cognitive impairment, inability to learn, dramatic loss of memory, depression, catatonia, loss of interest in life, loss of hearing, loss of vision, heart arrhythmias, stroke, loss of will to live, and death. ECT is physically and mentally debilitating, as the FDA's inclusion of ECT devices in Class III for over 35 years logically recognized.

5.     Neither FDA nor ECT device manufacturers know the mechanism of action by which ECT produces alleged therapeutic benefits.

6.     Before FDA issued the Final Order, Plaintiffs filed a Citizen Petition seeking a complete ban of ECT devices in the United States.  *See* Exh. 1.  That Petition was denied in 2018, and FDA referenced the Final Order, 83 Fed. Reg. 66103-66124, as its basis.  *See* Exh. 3 ("Denial Letter").

7.     FDA's decision to reclassify ECT Devices for *any* purpose into Class II is contrary to law as explained below.

## II.   <u>JURISDICTION AND VENUE</u>

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1346 (jurisdiction where the United States is a defendant).

9.     The Plaintiffs' requested relief is authorized under 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (further relief), as well as 5 U.S.C. § 702 (Administrative Procedure Act).

10.     Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because the Defendants reside in this district and a substantial part of the events giving rise to this action occurred in this district.

## III.   <u>PARTIES</u>

### A. <u>Plaintiffs</u>

11.     Plaintiff Atze Akkerman was administered ten (10) electroconvulsive therapy (ECT) treatments in 2003.  He experienced amnesia and severe loss of historical memory, including all memories of his children, parents, and wife. Although he had been a professional musician, composer and toured with the Navy Band, he lost his ability to play music.  He continues to suffer substantial long and short-term memory loss which impairs his ability to learn.  He remains on full disability as a direct and proximate result of ECT therapy. A full description of his injuries was submitted to the FDA in a detailed citizen Comment in FDA-2010-N-

4

0585 and FDA 2014-N-1210.  Mr. Akkerman also submitted a report to the FDA's MAUDE database.  Mr. Akkerman is a resident of California.

12.     Plaintiff Evelyn Scogin is a resident of Texas who suffered personal injury in the form of persistent and continuing memory loss and cognitive damage following ECT treatments in 2005.  She experienced severe memory loss, causing her not to recognize or have knowledge of friends and family.  She lost substantial memories of her youth.  She lost at least two years of memories preceding her ECT treatment.  ECT damaged her ability to walk, requiring use of a wheelchair for a considerable time.  She lost several teeth that were broken during ECT and suffered considerable pain throughout her body.  Ms. Scogin submitted a written statement opposing reclassification of ECT to Class II, which was read on the record to the FDA Advisory Committee in January 2011.

13.     Plaintiff Dianna Loper Posthauer suffered considerable damage from involuntary receipt of ECT over 35 years ago to treat post-partum depression.  She thereafter did not recognize her child and could not remember being married or bearing her child.  ECT caused permanent cognitive impairment, long term memory loss, and new memory disabilities.  Those injuries are continuing to present.  Ms. Posthauer submitted Comments to dockets FDA-2010-N-0585 and FDA 2014-N-1210.  Ms. Posthauer is a resident of Texas, and the Founder of Christians United for the Ban of Electroshock.

14.     Plaintiff Gary Simone received ECT treatments at Silver Hill Hospital, New Canaan, Connecticut, in February 2019, after the FDA denied the Petition and the Final Order at issue went into effect.  However, consistent with the inaccurate warnings published by the FDA in December 2018, Mr. Simone was not informed of the likely long-term or short-term memory loss, and cognitive impairment caused by ECT.  He continues to suffer severe short- and long-term memory loss and severe cognitive impairment, adversely affecting his daily routines and ability to function or work.

Complaint for Declaratory & Injunctive Relief

15.     Plaintiff Rachel Small received approximately 20 ECT treatments between November 2018 and February 2019 at UHS Behavioral Health Center, Westampton, N.J. Consistent with the inaccurate proposals and final warnings published by the FDA in December 2018, Ms. Small was not informed of the serious effects of the treatment, including but not limited, short- and long-term memory loss and severe cognitive impairment. Although Ms. Small has a Master's Degree in school counseling, recollection of the entirety of her education was eliminated by her ECT treatments, as well as the majority of her awareness of prior education and memories from her life.  She was unable to perform her the functions of work and lost her position.

16.     Plaintiff Tony Buonfiglio received a series of ECT treatments at the age of 16, several decades ago.  He was thereafter placed in special education classes because his memory and cognitive abilities were significantly diminished.  He experienced extensive and permanent memory loss, losing most memories of childhood and high school.  Those memories never returned.  His working memory, or short-term memory, is considerably diminished making work challenging.  Mr. Buonfiglio resides in Florida.

**B. <u>Defendants</u>**

17.     Defendant Robert M. Califf is the Commissioner of the United States Food and Drug Administration ("FDA") and is sued here in his official capacity. The Commissioner is responsible for FDA's administration of the federal Food, Drug, and Cosmetic Act ("FDCA").

18.     Defendant FDA is the federal agency with jurisdiction over the regulation of medical devices, including ECT devices.  FDA denied the Citizen Petition and issued the Final Order concerning ECT devices.

19.     Defendant United States created, organized, and operates the FDA as an administrative agency within the executive branch of government.

Complaint for Declaratory & Injunctive Relief

## IV.   **PROCEDURAL HISTORY AND REGULATORY BACKGROUND**

20.   The Medical Device Amendments of 1976 establishes three classes of devices based on their potential risks and harms to human life.  *See* 21 U.S.C. § 360c. Class I devices are those "not intended for use in supporting or sustaining life or of substantial importance in preventing impairment to human health, and they may not present a potential unreasonable risk of illness or injury." Class II devices are "devices for which general controls are insufficient to provide reasonable assurance of the safety and effectiveness of the device." Such devices thus require "specific controls" to assure safety and efficacy.  Class III products are those which "usually sustain or support life, are implanted, or present a potential unreasonable risk of illness or injury."

21.   FDA "decides the class of a device by evaluating the amount of regulation that provides reasonable assurance of the device's safety and effectiveness (i.e., the amount of regulation needed so that the device's probable benefits outweigh any probable risks of injury or illness)."  Exh. 3 at 1 (citing section 513(a) of the FD&C Act; 21 C.F.R. § 860.7(b)(3)) (parenthesis original).  The burden rests on the agency to establish that the regulations proposed ensure that potential benefits outweigh the potential risks.

22.   Devices used for ECT are classified by FDA as "preamendment device[s]." FDA regulates medical devices differently, depending on whether a device is a "preamendment" or "postamendment." *See* 21 C.F.R. §§ 860.81, 860.134.  A "preamendment device" is a device in commercial distribution prior to the Medical Device Amendments (May 28, 1976) which receives its medical device class status after (1) an FDA advisory committee makes a recommendation after sitting as a device classification panel; (2) FDA then publishes the panel's recommendations for comment, along with a proposed regulation classifying the device; and (3) FDA then publishes a final regulation classifying the device. *See* 21 U.S.C. § 360(c).

Complaint for Declaratory & Injunctive Relief

23.    FDA defines an ECT device as a "prescription device, including the pulse generator and its stimulation electrodes, used for treating severe psychiatric disturbances by inducing in the patient a major motor seizure by applying a brief intense electrical current to the patient's head." 21 C.F.R. § 882.5940(a).

24.    ECT electrically induces seizures in the brain through the administration of electricity through brain tissue either from temple to temple (bilateral) or front to back (unilateral) of the head.

25.    ECT has a history of use in patients without their consent, called "involuntary" ECT treatment, which continues in the United States today. ECT also has a history of use to punish or control patients, soldiers, and political dissidents. Patients receiving ECT are typically restrained and/or anesthetized.  Before ECT is administered, muscle paralyzers are normally administered to reduce the violent muscle contractions and seizures otherwise cause, not infrequently resulting in bone fractures, permanent spinal injuries and other injuries.  Studies reveal that longevity generally was reduced by ECT. Studies also reveal that it has no lasting benefit or legitimate medical purpose.

26.    When preamendment devices were classified pursuant to the Medical Device Amendments, there was no presumption that a device required Class III status, so, in 1979, FDA performed a *de novo* evaluation for ECT classification.

27.    Following consideration of relevant facts and evidence indicating ECT devices were inherently dangerous, FDA classified them as Class III. *See* 44 Fed. Reg. 51776, 51777 (Sep. 4, 1979); 21 C.F.R. § 882.5940(b) (May 11, 1987).  The information submitted to FDA demonstrated that ECT posed a serious risk to human health, caused brain damage and memory loss, and the safety and performance of ECT was incapable of being regulated through any controls.  *See* 44 Fed. Reg. 51776.

28.    The 1979 FDA Advisory Panel rejected FDA's proposed Class II classification for any purpose.  FDA agreed with the Advisory Panel and stated that

8

the characteristics of ECT devices had not been identified precisely enough such that special controls could be established that would provide reasonable assurance of the safety and effectiveness of the devices. 80 Fed. Reg. 81223, 81230 (Dec. 29, 2015).

29.    FDA's Final Ruling on the classification of preamendment ECT devices required manufacturers to submit premarket approval applications (PMAs) within 30 months of that ruling (April of 1982). *See* 44 Fed. Reg. at 51776–77. The manufacturers violated the FDA order; none submitted the required PMAs establishing safety and efficacy.

30.    PMAs require manufacturers to supply the FDA with substantial evidence of safety and effectiveness. FDA considers the PMA process vitally important to protect the public from dangerous and ineffective medical devices. The marketing and sale of Class III devices without PMA submission and approval, where PMA submission and approval is required, is illegal and violates 21 U.S.C. § 360e(a).

31.    The ECT manufacturers failure to submit the required PMAs became a fact widely reported in major medical journals. *See, e.g.*, Am J. Psychiatry 138:4, April 1981, p. 572 ("This ruling places the burden on manufacturers to prove that their respective devices are safe and effective… There does not appear to be any move on the part of the manufacturers to accomplish this.…"). That failure (and inherent inability to demonstrate safety and efficacy) should have rendered the devices "misbranded" and resulted in their removal from the market. No device was removed from the market.

32.    Although FDA considered reclassifying ECT devices from Class III to Class II multiple times between 1982 and 2018, ECT devices remained Class III the entire time. Nevertheless, FDA allowed ECT manufacturers to side-step the PMA process and submit 510(k) notifications. *See* Exh. 5 (Excerpts of FDA Executive summary Prepared for the January 27-28, 2011 Meeting of the Neurological Devices Panel, Meeting to Discuss the Classification of Electroconvulsive Therapy Devices,

Complaint for Declaratory & Injunctive Relief

at p. 66).

33.    That approach specifically conflicts with 21 U.S.C. § 360c and 21 C.F.R. § 807.81, which dictate that the preamendment devices themselves (which ECT manufacturers are using as predicate devices for their 510(k) submissions) are misbranded because they never met the burdens attendant to the PMA process.

34.    That unprecedented procedure, which conflicts directly with FDA law and policy, has allowed ECT devices to remain on the market, and therefore be utilized on patients, without any demonstration of safety and efficacy.  Whereas PMAs require evidence from clinical trials, 510(k) notifications do not.  21 U.S.C. §§ 360(c), 360e.  Thus, FDA created a process whereby it abridged its own evidentiary requirements, and permitted ECT device manufacturers to avoid scrutiny in the form of long-term clinical trials—which would conclusively reveal the long-term damage caused by ECT.

35.    In 1990 Congress passed the Safe Medical Devices Act of 1990 (the "SMDA").  That Act required FDA to:  (1) order industry members to submit safety and effectiveness data for preamendment devices (such as ECT devices) that were not yet required to undergo PMA approval, on or before December 1, 1995; (2) use that safety and effectiveness data to reevaluate the classification status for every preamendment device; and (3) within 12 months after the effective date of a regulation requiring a preamendment device to remain in Class III status, promulgate an additional regulation scheduling the deadline by which industry members must submit PMAs for such devices.  *See* 21 U.S.C. § 360e.

36.    The SMDA also updated the definition of Class II devices.  The updated definition required not just the existence of a performance standard, but also additional special controls, such as "postmarket surveillance, patient registries, development and dissemination of guidelines (including guidelines for the submission of clinical data in premarket notification submissions in accordance with section 510(k)), recommendations, and other appropriate actions as the secretary

Complaint for Declaratory & Injunctive Relief

deems necessary to provide such assurance" of safety and efficacy.  *Compare* 21 U.S.C. § 360c(a)(2) (1988) *with* 21 U.S.C. § 360c(a)(2) (1990).

37.   In 2009, the Government Accounting Office ("GAO") issued a report to Congress entitled, "MEDICAL DEVICES: FDA Should Take Steps to Ensure That High-Risk Device Types Are Approved through the Most Stringent Premarket Review Process." The report explained, "Although Congress envisioned that class III devices would be approved through the more stringent PMA process, and the Safe Medical Devices Act of 1990 required that FDA either reclassify or establish a schedule for requiring PMAs for class III device types, this process remains incomplete."

38.   FDA took limited and insufficient action in response.  FDA ordered ECT manufacturers to submit data and information regarding ECT device safety and effectiveness.  *See* 74 Fed. Reg. 16214 (Apr. 9, 2009).

39.   Only two American ECT device manufacturers (MECTA Corp. and Somatics LLC) responded, but neither provided information from clinical trials required in a PMA.

40.   Not only did MECTA and Somatics fail to submit rigorous clinical data as required by Congress and demanded by GAO, but they withheld adverse event data arising from use of the companies' devices.  Aware of that failure, FDA nevertheless declined to require MECTA to explain its failures to report harmful effects of its devices, nor to correct any of its incomplete and omitted MAUDE reports between 2011 and 2018 while the agency was considering the reclassification at issue in this case.

41.   ECT device manufacturers have never been required to submit safety and efficacy data that meets the standard set by Congress in 21 U.S.C. §§ 360e(i)(1), 360i  and by the FDA in its implementing regulations, 21 C.F.R. §§ 807.87, 814.20. They have not submitted high quality clinical trials that evaluate the myriad variables affecting safety and efficacy of devices that operate by imparting high levels of

electricity into the human brain to induce grand mal seizures.

42.     Proper clinical trials would need to evaluate the impact on safety and effectiveness of ECT double blind and "sham ECT" studies for each of the following issues:   asserted reduction of depression; whether there is brain damage as manufacturers now concede; whether there is damage to the heart, lungs, and other organs; evaluation of long-term effect on other medical conditions or pre-existing conditions; harm to elderly patients; long-term memory studies of at least 6 months, 1 year, 2 years, and 3 years; long term health generally compared to actuarial data; comparison of ECT patients' all-cause mortality with actuarial data to evaluate overall harms; presence of "short-term memory" disability; determination of patients' ability to learn and retain information and education (aka, anterograde amnesia); whether ECT prevents suicide or causes suicide; whether in the patient's view ECT had any short-term benefit; and whether in the patient's view the ECT had any long-term benefit.   Without clinical evaluation of those issues, which are central to the thousands of complaints made to the FDA regarding ECT, FDA cannot conclude that devices providing ECT–are either safe or effective.   FDA has never obtained or required the manufacturers to provide that essential information.

43.     Meanwhile, the evidence of ECT injuries is well documented, including permanent memory loss, cognitive impairment, other forms of brain damage, heart arrhythmias, loss of vision, loss of hearing, reduced life span, and death, among other adverse effects of the treatment.   *See* 80 Fed. Reg. at 81226.

44.     During 2010, FDA prepared an Executive Summary for a large Neurological Devices Advisory Panel charged with advising the FDA on the reclassification issue.   In the Executive Summary, FDA stated it received 3,045 comments, 79% of which opposed reclassifying ECT devices to Class II.   *See* Exh. 5 (Excerpts of FDA Executive summary prepared for Jan. 27-28, 2011 meeting of Neurological Devices Panel, at pp. 13-14); 80 Fed. Reg. at 81226. The comments FDA solicited from the public resulted in hundreds of first-hand accounts of

permanent memory loss, deaths of loved ones, and the debilitating effects of ECT. In addition, FDA received 92 group submissions representing 6,462 individuals opposing declassification and only 462 in favor.   *See* 80 Fed. Reg. at 81226.

45.   The FDA summarized the comments opposing ECT reclassification as follows:

> A majority of respondents identified an adverse event they felt was associated with ECT treatment.  The most common type of adverse event reported in the public docket was memory adverse event (529 reports).  This was followed by other cognitive complaint (413 reports), brain damage (298 reports) and death (103 reports).

46.   On January 27-28, 2011, the FDA's Neurological Device Advisory Panel held a meeting on the reclassification of ECT devices.  FDA provided the panel with an Executive Summary showing that FDA had excluded 94% (1163 out of 1231) of all scientific studies published before September 7, 2010 reporting on the safety and effectiveness of ECT.  FDA excluded all of the numerous studies related to brain damage and severe harms, as well as articles critical of the use of ECT.

47.   The panel nonetheless rejected reclassification for all intended uses except the treatment of catatonia.  The panel was split, however, regarding catatonia with numerous members disagreeing with the proposed reclassification even for that use.

48.   Despite clear opposition by FDA's own scientific reviewers, the agency reclassified ECT devices from Class III to Class II for certain categories, and did so for uses that were never presented to the Advisory Panel for consideration.  FDA later published a proposed administrative order intending to reclassify ECT devices used for treatment of "major depressive episode ("MDE") associated with major depressive disorder ("MDD") or bipolar disorder ("BPD") in patients 18 years of

Complaint for Declaratory & Injunctive Relief

age and older who are treatment-resistant or require a rapid response to their symptoms." *See* 80 Fed. Reg. at 81223. The Advisory Panel was not asked by the FDA to advise, consider or opine on "major depressive episode ('MDE') associated with major depressive disorder ('MDD') or bipolar disorder ('BPD') in patients 18 years of age and older who are treatment-resistant or require a rapid response to their symptoms."

49. Because the Advisory Panel failed to reach a consensus on reclassification from Class III to Class II for all intended uses, FDA's Proposed Order conflicted with the scientific advisory panel's proceeding.

50. FDA acknowledged "significant risks associated with ECT," including: adverse reaction to anesthetic agents/neuromuscular blocking agents, adverse skin reactions, cardiovascular complications, cognition and memory impairments, death, dental/oral trauma, device malfunction, manic symptoms, pain/discomfort, physical trauma, prolonged or tardive seizures, pulmonary complications, skin burns, and worsening of psychiatric symptoms if the treatment was ineffective. 80 Fed. Reg. at 81227. FDA recognized that the "significant risks" of cognitive and memory impairment were not uncommon, but FDA asserted that the benefits outweighed the risks without providing meaningful analysis for these newly reclassified uses. *See id.* at 81228.

51. FDA claimed to possess "new evidence" which supported reclassification but that new evidence was never specifically identified, and FDA acknowledged the evidence was limited to the listed conditions in the acute phase (i.e., less than 3 months after treatment). *See* 80 Fed. Reg. at 81227-28. That limitation was omitted from FDA's Final Order. *See* 83 Fed. Reg. 66103.

52. FDA claimed to "examin[e] the results of over 60 randomized controlled clinical trials comparing ECT with either placebo (sham) or antidepressant therapy in which ECT was superior for patients with MDD and BPD in patients 18 years of age and older who are treatment-resistant or who require a

Complaint for Declaratory & Injunctive Relief

rapid response due to the severity of their psychiatric or medical condition." 80 Fed. Reg. at 81227. But there are not, in fact, any specific "randomized controlled clinical trials comparing ECT with either placebo (sham) or antidepressant therapy in which ECT was superior for patients with MDD and BPD in patients 18 years of age and older who are treatment-resistant or who require a rapid response due to the severity of their psychiatric or medical condition." *Id.*

53.    FDA conceded that it found insufficient scientific evidence regarding the effectiveness and safety of ECT for other conditions (e.g., schizophrenia), other ages (i.e., any individual under the age of 18), or patients who did not receive a benefit from ECT therapy in initial or prior treatments. *See* 80 Fed. Reg. at 81228.

54.    FDA never demonstrated that, for the disorders for which it authorized reclassification, special controls would sufficiently establish the safe and effective use of ECT devices. FDA declined to require the device manufacturers to submit clinical trials demonstrating safety or efficacy, and failed to enforce its order to those manufacturers to so prove, thus leaving its record devoid of such evidence.

55.    In sum, FDA's draft order proposing reclassification of ECT devices into Class II for certain uses in 2015 was fraught with error; its conduct was arbitrary in key respects; and its conclusions and reasoning were capricious and unjustified. The record fell far below any justifiable basis for reclassification.

## V.    THE CITIZEN PETITION AND SUPPLEMENTS THERETO

56.    On August 25, 2016, Plaintiffs submitted a Citizen Petition to FDA, requesting that FDA "[p]romulgate a final regulation banning ECT devices" or "[i]ssue a final administrative order: (1) maintaining Class III designation [for ECT devices], and requiring a premarket approval application ('PMA') for any ECT device that is a preamendment device or any ECT device that has been found to be substantially equivalent to such a device; and (2) specifying that all other ECT devices have an approved PMA in effect before being placed in commercial

distribution for any purpose." Exh. 1 at 2 (parenthesis original). The Citizen Petition was docketed as FDA-2016-P-2559. *See* 80 Fed. Reg. 81223.

57.   The Citizen Petition describes errors in FDA's data analysis, explains instances where FDA permitted a regulatory course for ECT devices that the agency precludes in other circumstances, identified omissions from the factual record which FDA refused to address, identified the agency's arbitrary and capricious administrative decisions concerning ECT, collected examples of how FDA improperly abridged the factual record and permitted ECT device manufacturers to disregard administrative orders, and explained that FDA's proposed split-classification regime would increase misuse and abuse of ECT devices. It provided expert proof of physical brain damage caused by ECT. It provided evidence through peer reviewed published studies (which the FDA ignored), which flatly refuted both the safety and efficacy of ECT. FDA never meaningfully considered any of those positions. *See generally* Exh. 1.

58.   On August 29, 2016, FDA acknowledged receipt of the Citizens' Petition. On February 2, 2017, FDA provided an interim response, as required by 21 C.F.R. § 10.30(e)(2), which did not answer the substance of the Citizens' Petition.

59.   On July 29, 2017, Plaintiffs supplemented their Citizens' Petition. *See* Exh. 2 (the "First Supplement"). The First Supplement explained:

    a.   How FDA's "estimates" of mortality caused by ECT were inherently flawed, unsupported by references to the record, based on an estimate from a conflicted association that promotes ECT, and contradicted by existing evidence that FDA should have considered. *See* Exh. 2 at 2.

    b.   Evidence that the actual death rate from the sole state which required records be kept thereof, was 49 times higher than the FDA's estimate of deaths from ECT. *See id.* at 3.

    c.   That FDA's "death" statistic did not consider whether ECT *accelerated* death—a widely reported ECT side-effect documented in the peer

Complaint for Declaratory & Injunctive Relief

review literature yet ignored by FDA. *See id.* at 2.

    d.  How FDA selectively omitted consideration of numerous reports of permanent anterograde amnesia, rather than FDA's purported conclusion that anterograde amnesia returns to baselines within 3 months of ECT treatment. *See id.* at 4–5.

    e.  That FDA's proposed finding that ECT does not cause brain damage was fundamentally flawed and controverted by record evidence, and testimony presented to the Advisory Panel. *See id.* at 6–9.

    f.  That FDA erroneously concluded, contrary to the Advisory Panel, that Class II status for ECT therapy was appropriate for "MDE associated with MDD, and BPD." *See id.* at 10.

60.    Plaintiffs' counsel met with Defendants on July 31, 2017 wherein FDA received the First Supplement. *See* Exh. 3 (the "Denial Letter"). The First Supplement was officially filed on March 5, 2018. *See id.*

61.    On December 20, 2018, Plaintiffs supplemented their Citizens' Petition for a second time. *See* Exh. 4 ("Second Supplement"). The Second Supplement explained:

    a.  That major ECT device manufacturers had, in October 2018, acknowledged that ECT therapy causes serious and life-threatening harm to patients, and specifically acknowledged that ECT therapy causes brain damage. *See id.* at 1.

    b.  How ECT device manufacturers misrepresented, misreported, and withheld adverse event reporting, in violation of federal law and FDA regulations. *See id.* at 2.

    c.  How the ECT manufacturers had withheld MAUDE reports from the FDA during the entirety of the declassification proceedings, and had submitted the reports only because the company was a defendant in several lawsuits arising out of brain damage to patients. *See id.* .

Complaint for Declaratory & Injunctive Relief

d.  That FDA underreported the number of adverse events as affirmative evidence that there are *few, if any*, adverse events associated with ECT therapy when formulating the relevant Proposed Order reclassifying ECT devices, and in evaluating 510(k) submissions.  *See id.* at 6-7.

## VI.  <u>FDA DENIAL LETTER</u>

62.  The FDA ruled on the Citizen Petition in a Denial Letter issued December 21, 2018.  *See* Exh. 3.  That letter denied Plaintiffs' request to initiate a separate rulemaking banning ECT devices.  *See id.*  The FDA argued in its Denial Letter that the Final Order, 83 Fed. Reg. 66103, had revised the ECT device classification into Class II for treatment of catatonia or severe MDE associated with MDD or BPD in patients age <u>13 years or older</u> who are treatment-resistant or who require a rapid response due to the severity of their psychiatric or medical condition.

63.  The Denial Letter expressly incorporated provisions of the Final Order, which FDA issued contemporaneous with its Denial Letter.

64.  FDA failed to consider obvious errors in data that were apparent from a plain review of publicly available facts, including the late-reporting in the MAUDE database covering more than a 10-year period, but submitted one month after FDA's arbitrary cut-off for review of such reports. FDA's arbitrary cut-off of MAUDE data was nearly a year before FDA issued its final order, in which it asserted the adverse MAUDE data it considered was minimal.

65.  FDA provided no evidence that individuals less than 18 are generally diagnosed with catatonia or MDE associated with MDD or BPD.  FDA did not consider that there were no MDRs for individuals less than 18 years old because ECT use on adolescents was not the preferred treatment course, and generally was not the recommendation.[1]

---

[1]  For example, in Texas in 2016, in over 2,500 patients who received ECT therapy, only 15 patients were under age 18.  There were 0 patients under age 16

*Cont. on next page . . .*

18

Complaint for Declaratory & Injunctive Relief

66.     FDA arbitrarily and capriciously considered some anecdotal information but rejected a substantial number of others (more than 2,400 adverse events submitted in the public comments) without adequate justification or explanation.  FDA arbitrarily and capriciously considered anecdotal studies that supported the agency's reclassification effort while dismissing the vast majority, if not all, allegedly "anecdotal" evidence that opposed its position.  *See id.* at 7.

67.     FDA arbitrarily and capriciously rejected thousands of comments from individuals who had experienced the negative impact of ECT, although the agency is permitted to accept and does accept such evidence in other contexts.  *See id*. at 7. FDA dismissed that data *en masse* without considering the fact that many contained substantial detail indicative of reliability.  *See id.* at 7.

68.     FDA did not justify its rejection of Petitioner's evidence, which included peer-reviewed journals; the declaration of an expert witness containing admissible information regarding brain damage caused by ECT; among other evidence arbitrarily rejected by FDA.  *See id*.

69.     FDA also arbitrarily and capriciously cherry-picked narrow sets of data to support reclassification when a broader analysis would have revealed its conclusion to be contradicted.  For instance, FDA cited the fact that Texas reported 0 deaths from ECT in 2016 to support its conclusions of safety.  *See id.* Yet, in 2011 Texas reported 23 deaths.  Thus, by simply selecting the most favorable statistical year, FDA acted in a blatantly biased and arbitrary manner.

70.     None of the information submitted to FDA or cited by FDA in its Final Order support, demonstrate, or even explain how special controls could have any

---

who received ECT therapy because that is forbidden at law.  *See* Tex. Dept. of St. Health Serv., Report on Electroconvulsive Therapy, FY 2016 (Feb. 2017). That represents approximately 0.5% of all ECT therapies were for patients under age 18. It is a statistical error for FDA to conclude that because there are no MDRs for individuals under age 18, it is affirmative evidence that there are no risks for individuals under age 18. And, manufacturer MECTA has willingly suppressed the submission of adverse reports to MAUDE, *see infra*.

Complaint for Declaratory & Injunctive Relief

effect on the safe and effective use of ECT in those with MDE, MPD, BPD, and catatonia or for anything else.

71.     To properly determine whether special controls could reduce safety risks or increase efficacy, one would need to perform detailed and extensive clinical trials evaluating the myriad variables that could impact those factors and the effect proposed special controls would have on same.  Upon information and belief, no such studies have been done or submitted to FDA that would meet FDA's standard of "valid scientific evidence" necessary to establish safety and efficacy.  *See* 21 C.F.R. § 860.7(c)(2).

72.     FDA also never explained how it could conclude that informed consent and labeling disclosures would mitigate safety risks associated with an inherently dangerous procedure for which valid clinical studies have never been performed to quantify the incidence of serious adverse events.  A patient (or their guardian) cannot make informed decisions regarding treatment where the rate of adverse events is unknown.

73.     FDA arbitrarily and capriciously concluded that special controls of "establishing technical parameters for the device along with non-clinical testing data to confirm the electrical characteristics of the output waveform" were sufficient to ensure safety.  Indeed, such issues are largely irrelevant to establishing either safety or efficacy of ECT.  Thus, FDA had no scientific basis to conclude that such controls even impact safety at all.

74.     Vocal members of the Advisory Panel recognized that a label for users and patients creates no actual mitigation.  The Advisory Panel outlined the clear and critical reasons why these special controls are either insufficient or not sufficiently supported by scientific evidence.  FDA ignored these Advisory Panel's warnings.

75.     FDA also ignored the existence or importance of many adverse effects from ECT which were cited in its own "supporting" references, including:  organic brain syndrome, abnormal EEG, new onset seizures, status epilepticus, neuroleptic

Complaint for Declaratory & Injunctive Relief

malignant syndrome, vertebral fracture, mania, agitation, marked confusion, memory loss, disinhibition and headache, suicidality, blunted affect, emotional withdrawal, anxiety, hostility, suspiciousness, hallucinations, bizarre behaviors, unusual thought content, self-neglect, disorientation, conceptual disorganization, motor retardation, uncooperativeness, excitement, elevated mood, grandiosity, distractibility, motor hyperactivity, bodily concerns, strange mannerisms and posturing.

76.    FDA also excluded from the warning label that, although muscle paralyzing drugs were required, those very dangerous drugs are subject to Black Box warnings for pediatric usage.

77.    FDA's failure to notify the public that it intended or was even considering reclassification of ECT for pediatric use effectively barred the public from submitting comments, evidence, and feedback regarding problems with FDA's reclassification for that vulnerable population.

78.    FDA never informed the Advisory Committee that it intended to reclassify ECT for pediatric use.

79.    FDA also arbitrarily and capriciously employed a dangerous "split classification" approach whereby it reduced ECT device classification to Class II for certain uses, while maintaining Class III for all other uses.  FDA was warned that such a split classification would effectively reclassify all ECT devices for all uses, and thus eliminate protection for uses FDA deemed worthy of Class III status. Because FDA does not regulate the practice of medicine, practitioners may use FDA-cleared devices for unapproved uses with patients.  Downgrading ECT to Class II allows the products to enter the market through the 510(k) pathway without submitting PMA-level data, but still be used for unapproved uses that remain Class III.

80.    To date, no PMA has been submitted by a US manufacturer and there is no purpose or incentive for them to do so. The split classification has clearly made

the submission of a PMA unnecessary and superfluous for literally any uses of the device, and FDA has effectively reclassified all ECT devices to Class II despite FDA's own conclusion that they are not safe or effective for the majority of uses.

## VII.   FDA FINAL ORDER

81.     On December 26, 2018, contemporaneous with its Denial of the Plaintiff's petition, FDA published its Final Order reclassifying ECT devices for use in treating catatonia or severe MDE associated with MDD or BPD in patients age 13 years and older who are treatment resistant or require a rapid response due to the severity of their psychiatric or medical condition into class II.  *See* 83 Fed. Reg. 66103.

82.     FDA represented that it did not consider comments from patients submitting valid scientific evidence, thousands of whom had informed the FDA they had been harmed by ECT in a public docket.  *See* Exh. 3 at 7.  The Final Order conceded that FDA did not weigh material evidence.  *See* 83 Fed. Reg. at 66105 (noting that single case reports or opinion-based commentary "were not relied upon to support this reclassification.").  The comments not "considered" by FDA were those that generally opposed reclassification.

83.     The Final Order also revealed that FDA's decision to reclassify ECT for use in patients with catatonia (in direct conflict with FDA's stated intent in the Proposed Order) was based on the very same evidence that FDA possessed before it issued the Proposed Order.  FDA therefore contradicted itself regarding whether that limited and unscientific evidence could justify reclassification in Class II, and denied the public an opportunity to criticize or comment on that evidence because FDA did not include such information in the Proposed Order despite its possession of same.

84.     The labeling requirements set forth in the Final Order misrepresent the body of science supporting the warnings provided, and other significant warnings FDA should have included, but did not.  That conduct is particularly egregious given

22

that the patient population subject to the reclassification order is uniquely vulnerable, as they are characterized as "treatment resistant" or requiring urgent intervention, are often mentally ill and may be under 18 or catatonic (and thus vulnerable to abuse).

85.    FDA's Final Order included a listing of frequent adverse events by order of occurrence which was not based on proper data and excluded a large body of evidence suggesting the rate of occurrence for severe adverse events is higher than FDA admits.  FDA did not list brain damage as a potential adverse event although the ECT device manufacturers recognized brain damage as a potential risk from ECT.  FDA also omits the known and proven risk that ECT reduces life expectancy.  FDA does not possess any evidence or explanation for how a labeling disclosure could reduce such risks, particularly when FDA does not even require those risks to be listed on the label.

86.    FDA lacks evidence that ECT is safe in pediatric populations.

87.    FDA excluded from its consideration MAUDE reports that were made after the cutoff date by ECT manufacturers that had withheld mandated adverse event reports for more than a decade.  Thus, FDA arbitrarily and capriciously excluded from consideration newly obtained evidence that demonstrates serious risks to children.

88.    As in the Denial Letter, FDA's Final Order never explained how or why its chosen special controls could mitigate risks of ECT.  FDA provided no affirmative evidence demonstrating that the vague special controls identified have any effect on the safe and effective use of ECT devices.

89.    FDA nonetheless recognized as early as the Panel hearings in 2011 that if the risks could not be mitigated, ECT devices must come off the market.  One panel member posed a question to FDA: "And if we can't mitigate the risks, it needs to remain a Class III.  If we can mitigate the risks, it goes to a Class II.  Now am I incorrect in that definition?"  Ms. Marjorie Shulman, FDA Programs Operations

Staff, Office of Device Evaluation, responded: "You are absolutely correct." FDA-2014-N-1210-3471.

90.     FDA dismissed concerns with off-label use and the ability of device manufacturers to avoid submission of PMAs by encouraging off-label use for the indications still in Class III.   These indications increase risk, decrease patients' ability to receive the purported benefits of special controls (especially labelling special controls which are particularly tailored to the class II indications and not all conditions in off-label use), and the Final Order permits manufacturers to avoid regulatory and statutory requirements for disclosure.   But FDA was unconcerned with these issues and did not materially consider this aspect of the problem.

## VIII.     RECORD EVIDENCE THAT THE USE OF ECT IS INHERENTLY DANGEROUS

91.     Though largely ignored by FDA, the record contained substantial evidence that ECT devices pose an unreasonable and unacceptable risk to patient safety and lacked any demonstrated evidence of long-term safety and efficacy.

92.     Comments from victims, researchers and physicians (including doctors that qualify as experts in the field) noted that by grandfathering ECT devices into exceptions to testing requirements (i.e., evidence necessary to support PMAs), FDA never required ECT device manufacturers to seriously test or analyze their products. *See* Exh. 6 (FDA ID: FDA-2014-N-1210-0967; Tracking ID: 1k0-8ofw-57ae).

93.     Medical professionals explained that ECT cannot reasonably be categorized in Class II.   Examples of Class II devices are acupuncture needles, syringes, air purifiers, contact lenses, surgical gloves, powered wheelchairs, pregnancy test kits, surgical masks and thermometers.   *See id.*   No Class II status has, until the FDA Order, ever been given a device that imparts levels of electricity into the brain sufficient to induce a grand mal seizure.

94.     ECT devices impart up to 440 electrical volts into the brain until they

Complaint for Declaratory & Injunctive Relief

induce "[a] major motor seizure" in the patient. *See* 21 C.F.R. § 882.5940(a). While inducing a major motor seizure (grand mal seizure) is the supposed purpose of ECT, major motor seizures have not been shown by competent and reliable scientific evidence to produce *any* medical benefit. *See, e.g.*, Exh 1 (Citizens' Petition) at 30; Ex 9 to Citizens' Petition. Record evidence also indicates that the manufacturers recommend that treating physicians impart to patient brains several times the amount of electricity needed to induce a seizure, as a so-called "therapeutic dose." Thus, it is not only a seizure that is induced, but an excessive flow of electricity through the brain for which there is also no proof of therapeutic benefit. This alone strongly suggests the purpose of ECT is brain damage, or to batter a hapless and disturbed patient into silence and forgetfulness, as the true purpose of ECT. For its part, the FDA makes no representation as to how ECT "works."

95. Electro-medical devices that rely on the introduction of electrical currents to trigger a biophysical reaction are generally classified as Class III medical devices. *See, e.g.*, 21 C.F.R. §§ 860.10., 868.5400 (Electroanethesia apparatus); 21 C.F.R. §§ 882.5800(b)(2) (Cranial Electrotherapy Stimulator to Treat Depression), 882.5940 (ECT devices); *see also* Stimulator, Electrical, Implanted, For Parkinsonian Symptoms; Stimulator, Electrical, Implanted, For Essential Tremor; Dorsal Root Ganglion Stimulator For Pain Relief; *but see* 21 C.F.R. § 882.5800(b)(1) (Cranial Electrotherapy Stimulator to treat Insomnia and/or Anxiety receiving class II certification where the only risks of product use are headaches or dizziness and no adverse events are reported in the MAUDE database). Such devices are by virtue of their bioelectric function, and electric currents applied to the delicate brain in amounts thousands of times higher than the brain itself uses, inherently dangerous and therefore require the highest level of scrutiny.

96. Similar to the 2009 Public Docket Comments, thousands of comments identified specific instances where ECT was ineffective and unsafe. *See generally* FDA ID: 2014-N-1210.

97.     Numerous studies, including a peer-reviewed, large retrospective study, demonstrate that ECT drastically shortens the lifespan of recipients.  FDA excluded the peer-reviewed studies submitted on this point.

98.     There is extensive information and evidence demonstrating that persistent, permanent cognitive impairment is a typical and expected outcome of ECT.  FDA excluded evidence of those outcomes.

99.     FDA refused to consider substantial evidence that "anterograde" memory—i.e., ability to learn and ability to retain recent events—is dramatically damaged by ECT.  A 1985 NIH Consensus Statement on ECT, which is in the record, explained:

> It is, however, well established that ECT produces memory deficits.  Deficits in memory function, which have been demonstrated objectively and repeatedly, persist after the termination of a normal course of ECT. Severity of the deficit is related to the number treatments, type of electrode placement, and nature of the electric stimulus. ... research conducted as long as three years after treatment has found that many patients report that their memory was not as good as it was prior to the treatment.

100.    The National Council on Disability, a federal agency, published an investigation of ECT patients, "From Privileges to Rights: People With Psychiatric Disabilities Speak for Themselves", dated January 20, 2000, and concluded that ECT causes grave disabilities:

> Even proponents of electroconvulsive therapy (ECT or shock treatment) admit that it is a highly controversial procedure. Many of those who have been subjected to it consider it to have been extremely physically and emotionally damaging, and many believe that it has had long-lasting adverse effects, particularly on memory. The stories of those who testified as to the harmfulness of ECT in their own lives were heart-rending, especially since many witnesses were given the procedure without full

26

informed consent, including information about the risks of long-term memory loss.

101.   FDA ignored manufacturers' admissions of brain injury as well as other record evidence, including an expert declaration submitted with the Citizen Petition, that ECT caused holes in brain cells.

102.   An extensive published peer-reviewed study by ECT researchers John Read and Richard Bentall was provided to the FDA, "The effectiveness of electroconvulsive therapy" which reviewed the substantial "sham" ECT studies. They revealed that studies even by proponents of ECT largely resulted in demonstrations of complete ineffectiveness, and that any purported benefits were transitory and short-lived.

## IX.   CLAIMS FOR RELIEF

### COUNT ONE

**FDA Violated the Administrative Procedure Act ("APA") (5 U.S.C. § 553(b)(3)) by Promulgating a Final Order that Differed Materially from its Proposed Order (21 C.F.R. § 10.40) without Affording a Reasonable Opportunity for Notice and Comment**

103.   Plaintiffs incorporate by reference all allegations contained in Paragraph 1 through Paragraph 102.

104.   FDA violated the Administrative Procedure Act ("APA") (5 U.S.C. § 553(b)(3)) by failing to provide required notice and opportunity for comment on material aspects of the Final Order.  When FDA published the Proposed Order, it falsely represented that reclassification into Class II was only being considered for adult populations and that catatonia was not a condition FDA would consider for reclassification.  Yet, the Final Order permitted use of ECT devices on children as young as 13 years old and on patients with catatonia.  FDA's failure to provide meaningful notice and comment opportunities and its affirmative misrepresentations to prospective commenters regarding those expanded populations violates the APA

27

and renders the Final Order unlawful.

105.   The FDA acted in violation of 5 U.S.C. § 553(b)(3) because the Final Order materially differed from the Proposed Order, and those materially different components were not logical outgrowths of the Proposed Order nor was the public afforded notice and opportunity to comment as required by law.

106.   FDA violated the APA by failing to provide required notice and comment on two critical aspects of the Final Order:

      a.   Expansion of the permissible use of ECT devices to pediatric populations (13-17 years old); and,

      b.   Expansion of the permissible use of ECT devices to patients with catatonia.

107.   The Proposed Order purported only to reclassify ECT Devices used to treat MDE associated with MDD and BPD for patients aged 18 and older.

108.   Not only did the Proposed Order omit language proposing reclassification to pediatric populations, the Proposed Order actually *affirmatively represented* that there was an absence of "[d]ata on the use of ECT in children and adolescents… hence the recommended reclassification is limited to patients 18 years of age and older." 80 Fed. Reg. at 81228.

109.   As a result, the public, medical professionals, and other stakeholders were denied (1) notice that FDA intended to expand the patient population in its Final Order to include pediatrics and (2) the opportunity to provide comment, data, studies, or other feedback on that significant proposed change.

110.   Not only did the Proposed Order omit language proposing reclassification for treatment of those with catatonia, the Proposed Order actually *affirmatively represented* that catatonia was not subject to further reconsideration because FDA lacked evidence demonstrating sufficient safety and effectiveness to reclassify ECT use for patients with catatonia.

111.   Because FDA disclaimed any intent to consider catatonia as part of the

28

reclassification process, all stakeholders who reviewed the Proposed Order reasonably believed, in reliance on FDA's statement, that the Final Order would not apply to patients with catatonia.

112.   As a result, the public, medical professionals, and other stakeholders were denied (1) notice that FDA intended to expand the patient population in its Final Order to include patients with catatonia and (2) the opportunity to provide comment, data, studies, or other feedback on that significant proposed change.

113.   FDA's failure to provide adequate notice to facilitate meaningful comment was pernicious and injurious because the two populations impacted by FDA's unlawful surprise change to the Proposed Order are particularly at-risk.

114.   Adolescents lack legal consent to control their own healthcare decisions and their brains are developing and changing substantially.  Electric shocks to the adolescent brain may result in permanent and irreversible damage, or otherwise stunt or alter development.  The risks associated with ECT use in that population must be fully vetted as to safety and efficacy and subject to public comment.  FDA unlawfully deprived the public of that right and now purports to permit the use of ECT shock treatment on children as young as 13 without proper scientific evaluation of the potential risks associated with electrocuting a developing brain.

115.   Those with catatonia are also particularly vulnerable and incapable of making informed medical decisions on their own behalf.  As a result, that population must be protected and FDA must afford a fair and complete opportunity for notice and comment before exposing that vulnerable population to less restricted use of potentially dangerous and deadly medical treatment.

116.   Plaintiffs therefore request that this Court hold FDA's Final Order at 83 Fed. Reg. 66103 unlawful, because the Final Order is not a logical outgrowth of the Proposed Order as it expands the Proposed Order on bases explicitly disclaimed from consideration by FDA, in violation of 5 U.S.C. § 553(b)(3).  Plaintiffs therefore also request that this Court hold FDA's Final Order at 83 Fed. Reg. 66103 unlawful,

because FDA failed to afford the regulated class notice of its intended actions and an opportunity to comment on its actions as required by law.

## COUNT TWO

### FDA Violated the APA (5 U.S.C. § 706) and Acted Arbitrarily and Capriciously by Imposing Arbitrary and Biased Criteria for Evidence Inclusion and Exclusion

117.   Plaintiffs incorporate by reference all allegations contained in paragraph 1 through paragraph 116, *supra*.

118.   FDA acted arbitrarily and capriciously in violation of the APA by enforcing facially inconsistent and biased scientific standards regarding what evidence the agency would and would not consider.   FDA rejected nearly all evidence contrary to its preferred outcome, which it deemed anecdotal or insufficiently backed by science, but accepted similarly anecdotal and even less well-supported scientific evidence when that evidence supported FDA's conclusion. That is the definition of arbitrary and capricious agency action in violation of the APA.

119.   FDA determined that adverse events reported in the public comments (often by individuals who personally experienced the adverse event) do not constitute evidence worthy of consideration in evaluating the safety and effectiveness of ECT devices. *See, e.g.*, 83 Fed. Reg. at 66105.

120.   FDA stated that experiential information conveyed in comments is not "valid scientific evidence" because it is anecdotal and such evidence may only be considered for the purpose of identifying a device, but not evaluating its safety and efficacy.   That conclusion is arbitrary, capricious, and in violation of the law because: (1) FDA only excluded as anecdotal and unscientific comments and experiential data that conflicted with FDA's chosen reclassification objective while simultaneously accepting similarly anecdotal information that supported FDA's course; and (2) FDA's claim that experiential and anecdotal data may only be used

Complaint for Declaratory & Injunctive Relief

to identify a device and not to evaluate safety risks is in conflict with the law. 83 Fed. Reg. at 66105.

121. FDA engaged in arbitrary and capricious conduct when it applied facially conflicting standards to the same types of evidence. FDA rejected comments containing experiential data on the basis that such anecdotal evidence is not "valid scientific evidence" and cannot be accepted for the purpose of identifying safety risks or adverse events. Yet, FDA did accept such experiential data for the purpose of acknowledging the existence of low-risk adverse events that would not undermine its ultimate conclusion and for the purpose of supporting its claims of safety and efficacy.

122. FDA Section 860.7 cannot reasonably be read to permit FDA's exclusion of relevant comments which present adverse events, or negative outcomes associated with ECT use.

123. FDA therefore improperly and arbitrarily rejected relevant anecdotal evidence that demonstrated the harms caused by ECT use on the basis of an inapplicable regulatory provision, which, even were it to apply, would plainly permit consideration of such evidence.

124. Plaintiffs request that this Court hold that FDA's exclusion of experiential evidence demonstrating that ECT is dangerous and ineffective is unlawful, arbitrary, and capricious because it is not rational or logical, is arbitrarily applied, runs contrary to applicable regulations, and is thus a violation of 5 U.S.C. § 706.

## COUNT THREE

**FDA Violated the APA (5 U.S.C. § 706) and Acted Arbitrarily and Capriciously by Permitting ECT Devices to be Marketed and Sold Without Meeting the Agency's Burden and Obligation to Show Sufficient Scientific Evidence of Safety and Effectiveness**

125. Plaintiffs incorporate by reference all allegations contained in

31

paragraph 1 through paragraph 124, *supra*.

126.   FDA acted arbitrarily and capriciously in violation of the APA by reclassifying ECT devices to Class II for use in individuals ages 13 and older without any valid scientific evidence of efficacy and without sufficient evidence of safety. The record confirms ECT is dangerous, produces a wide range of adverse reactions, among them serious permanent injury and death.  Meanwhile, FDA possesses no "valid scientific evidence" and certainly no gold standard placebo-controlled double-blind clinical trials (which it requires of every other dangerous device used in the US) demonstrating efficacy.  FDA's complete failure to require manufacturers to meet FDA's own evidentiary threshold and FDA's failure to meet its congressionally imposed burden created to protect American lives, constitutes arbitrary and capricious conduct in violation of the APA.

127.   There is no scientific evidence to corroborate the random imparting of high electrical currents into the brain affects any change in the underlying medical condition such that the treatment can be proven efficacious.

128.   Despite the myriad of critical variables, ECT manufacturers have never submitted, nor has FDA evaluated, large-scale placebo controlled clinical trials that isolate and evaluate each of the variables for safety and efficacy.

129.   FDA requires every other Class III medical device and every other drug put into commerce in the United States to provide substantial evidence of safety and efficacy in the form of gold standard clinical trials.  Yet, FDA has never required that of ECT manufacturers who sell a device designed to damage the human brain of individuals who are already mentally compromised.  Now, under the Final Order, such devices can be used on **children as young as 13 years old**.

130.   Stated simply, without knowing how the device works biomechanically or performing and collecting the gold standard clinical trials required by law, it is impossible to know how the device works *safely and effectively* or how it might be restricted so as to reduce the risk of adverse effects, temporary, long term, and

Complaint for Declaratory & Injunctive Relief

permanent.

131.   FDA is obligated to determine whether the *probable benefits* to "The effectiveness of electroconvulsive therapy" which reviewed the substantial "sham" ECT studies.   They revealed that studies even by proponents of ECT largely resulted in demonstrations of complete ineffectiveness, and that any purported benefits were transitory and short-lived. The evidence must "adequately demonstrate the absence of unreasonable risk of illness or injury associated with the use of the device."  *See id.*

132.   But FDA lacked "valid scientific evidence" of both safety and efficacy under its own standards when it issued the Final Order.   In fact, the evidentiary record reveals that ECT devices are neither safe nor effective, and therefore should be properly classified as a banned device. *See* 21 C.F.R. § 895.21.

## A. The FDA Acted Arbitrarily and Capriciously by Denying the Petitioners' Request to Ban ECT Devices

133.   The Citizens' Petition requested that FDA reclassify ECT devices as "banned."

134.   Medical device bans must be established based on FDA's review of "*all available data and information*," which would include patient reports of adverse events. *See id.*; *see also* 21 C.F.R. § 895.20.

135.   The Final Order admitted that FDA did not consider all available data and information.   The FDA failed to follow its own guidelines and regulations because it did not consider *all available data and information*.   The evidence in the record (had it been considered) demonstrates that ECT device manufacturers deceive patients about the benefits of the device and use of the devices poses an unreasonable and substantial risk of injury to patients.

136.   FDA did not consider, and did not apply, the appropriate standard to determine whether ECT devices should be "banned" for treatment of all disorders.

Complaint for Declaratory & Injunctive Relief

FDA thus acted arbitrarily and capriciously in denying Plaintiffs' request to ban ECT devices.

## B. FDA Acted Arbitrarily and Capriciously by Reclassifying ECT Devices into Class II Without Requisite Proof of Safety and Efficacy

137. Independent from FDA's arbitrary and capricious decision to deny Plaintiffs' request to ban ECT devices, FDA acted arbitrarily and capriciously in reclassifying ECT devices into Class II because FDA lacked an adequate scientific basis so to do.

138. FDA bears the burden of establishing that reclassification is appropriate. To reclassify a device from Class III to Class II, FDA must have valid scientific evidence establishing a reasonable assurance of safe and effective use of the device when used along with special controls. *See* 21 U.S.C. § 360c(a)(1)(B).

139. FDA lacks the valid scientific evidence necessary to establish that special controls provide reasonable assurances of safe and effective use of ECT devices and thus FDA cannot reclassify the devices into Class II for any purpose.

140. FDA also violated the APA (5 U.S.C. § 706) and acted arbitrarily and capriciously by adopting scientific conclusions that run contrary to the evidentiary record. FDA rejected or excluded a substantial number of studies that reached scientific conclusions in conflict with FDA's preferred reclassification. FDA offered no reasonable scientific valid basis to reject that material.

141. FDA also violated the APA (5 U.S.C. § 706) and acted arbitrarily and capriciously by finding that reclassification was appropriate for the expanded patient population.

142. FDA erred as a matter of law and acted arbitrarily and capriciously because it concluded, without any reasoned basis or valid scientific support, that special controls provided adequate assurances of safety. The proposed special controls have no effect on the safety or effectiveness of ECT use.

143.   FDA procedurally and substantively failed to collect an adequate record on the issue of safety and effectiveness or the efficacy of special controls in ensuring safety.

144.   The record reveals ECT devices to be inherently dangerous and that special controls cannot mitigate those inherent dangers in a manner that ensures reasonable and reliable safety.

145.   FDA erroneously placed the scientific burden of demonstrating the insufficiency of special controls on those opposed to reclassification rather than on the device manufacturers and FDA itself, as the law requires.   21 U.S.C. § 360c. That erroneous burden shift violates law and constitutes arbitrary and capricious activity under the APA.

146.   The absence of the PMA data—and its required substantive submissions of safety and effectiveness data—is highly prejudicial to the public and the patient populations subjected to ECT treatment.

147.   The Final Order is therefore unlawful as it was promulgated through arbitrary and capricious agency action borne of a biased and irrational agency policy directive.

## **COUNT FOUR**

### **FDA Violated the APA (5 U.S.C. § 706) and Acted Arbitrarily and Capriciously by Finding that "Labeling" Standards Alone Were Viable Special Controls**

148.   Plaintiffs incorporate by reference all allegations contained in paragraph 1 through paragraph 147, *supra*.

149.   FDA acted arbitrarily and capriciously in violation of the APA when it determined, without any "valid scientific support" or explanation, that special controls in the form of labeling and informed consent were sufficient to mitigate the risks associated with use of ECT devices.   FDA has no "valid scientific evidence" that evaluates the impact of special controls on ECT treatment, and where a device

35

is inherently dangerous and designed to cause brain injury, those special controls would appear facially incapable of risk mitigation.  FDA's complete lack of evidence or explanation for *how* labeling and informed consent, or other special controls, could mitigate ECT-related risk demonstrates that FDA failed to consider a critical aspect of the problem in violation of the APA.

150.   FDA failed to consider important aspects germane to its reclassification by failing to properly evaluate all factors related to whether special controls, in the form of labeling and informed consent, were adequate to provide reasonable assurance of safety for ECT devices.

151.   Labeling and informed consent does not change the fundamental characteristics of the device.  ECT devices, regardless of their label, rely on the same mechanisms of action, still cause the same potential adverse outcomes, and those adverse outcomes occur at the same rate.

152.   FDA possesses no evidence to the contrary and no clinical trials have been performed sufficient to determine if there are labeling directives or parameters that could improve safety outcomes.

153.   FDA certainly possesses no evidence or valid scientific evidence related to the impact of device parameters or special controls on the safety of ECT devices on children or those with catatonia.

154.   FDA assumed without any evidence (*see supra*) or analysis that special controls positively impact the safety and efficacy of ECT devices.  That assumption is unsupported at law and fact, contradicts prior FDA statements, and is insufficient to support reclassification.

155.   FDA thus failed to consider an important aspect of the problem and constitutes arbitrary and capricious action in violation of the APA.

/ / /

/ / /

Complaint for Declaratory & Injunctive Relief

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT FIVE

**FDA Violated the APA (5 U.S.C. § 706) and Acted Arbitrarily and Capriciously by Finding that Proposed Special Controls Are Proper for Use of ECT Devices with Pediatric Patients**

156.    Plaintiffs incorporate by reference all allegations contained in paragraph 1 through paragraph 155, *supra*.

157.    The Final Order reclassified an ECT to Class II when the device is "intended to treat catatonia or a severe major depressive episode (MDE) associated with major depressive disorder (MDD) or bipolar disorder (BPD) in *patients aged 13 and older* who are treatment-resistant or who require a rapid response due to the severity of their psychiatric or medical condition."   21 C.F.R. § 882.5940(b)(1) (emphasis added).

158.    The special controls required for a Class II ECT device include, but are not limited to, labeling provided to patients. *See id*. at § 882.5940(b)(1)(ix).   The required patient labeling must include, inter alia, relevant contraindications, warnings, and precautions; a summation of the clinical testing and adverse events and complications that occurred with the device; information on how the device operates; potential benefits; alternative treatments; a warning statement that says, "Warning: ECT device use may be associated with: Disorientation; confusion, and memory problems"; absent performance data to the contrary, a warning statement that says, "Warning: When used as intended this devices provides short-term relief of symptoms. The long-term safety and effectiveness of ECT treatment has not been demonstrated"; and statements as to known risks (e.g., manic symptoms, pain, skin burns, pulmonary complications, cardiovascular complications, and death) absent performance data to the contrary. *See id*.

159.    FDA acted arbitrarily and capriciously in violation of the APA when it determined, without any "valid scientific support" or explanation, that special controls in the form of labeling and informed consent were sufficient to mitigate the

Complaint for Declaratory & Injunctive Relief

risks associated with use of ECT devices on pediatric populations. FDA has no "valid scientific evidence" that evaluates the impact of special controls on ECT treatment (generally), but more specifically, FDA concedes that it lacks any evidence related to ECT safety and efficacy in pediatric populations. Children are a particularly vulnerable population entitled to greater protection than adults, and many, if not most, of them are not in a position to comprehend the patient labeling. FDA's complete failure to consider critical aspects of the problem related to ECT use on developing adolescent brains and potential permanent brain damage to adolescents, violates the APA.

160. The Final Order expands use of ECT devices to patients aged 13 and up. That reclassification differed substantially and materially from the Proposed Order which indicated reclassification of ECT devices for people ages 18 and up and expressly disavowed an intent to reclassify for use in pediatric populations.

161. The Final Order does not provide any support for the proposition that special controls in the form of labeling and informed consent would increase safety and efficacy in patients under 18 years old.

162. Nor does the Final Order contain any analysis or explanation for how special controls could even theoretically mitigate the inherent risk of ECT treatment on a developing human brain.

163. Moreover, upon information and belief, FDA possesses no reliable clinical trials that have evaluated the impact of ECT treatment on a developing human brain. FDA admitted in the Proposed Order that it lacked valid scientific evidence and did not have any data regarding the safety and efficacy of ECT devices on populations under 18.

164. To the extent FDA reversed its position, it relied on the minimal and inadequate information. There is simply insufficient evidence and data to support FDA's conclusion that special controls could ensure sufficient safety for the use of ECT devices in pediatric populations.

Complaint for Declaratory & Injunctive Relief

## COUNT SIX

**FDA Acted Arbitrarily and Capriciously in Violation of 5 U.S.C. § 706 When It Failed to Properly Consult with a Classification Panel and Intentionally Avoided a Contradictory Recommendation by the Panel (21 C.F.R. §§ 860.125 and 860.130)**

165.   Plaintiffs incorporate by reference all allegations contained in paragraph 1 through paragraph 164, *supra*.

166.   FDA is required to consult with a reclassification panel as part of the reclassification process. *See* 21 C.F.R. § 860.130 ("[t]he Commissioner shall consult with a classification panel and may secure a recommendation with respect to reclassification of a device from a classification panel.").

167.   FDA violated the law by failing to properly consult with a classification panel and by intentionally avoiding the panel's contradictory recommendation when FDA issued a Final Order that did not significantly overlap the issues presented to the panel.  The public is entitled by law to review the panel's recommendation on issues contained in the reclassification order.  FDA intentionally issued a directive to the reclassification panel that did not overlap the issues contained in the Final Order and thereby avoided the implication of the panel's recommendation *against reclassification* while also denying the public its right to consider the panel's *pertinent* opinion.  That conduct violated the law and renders the Final Order invalid.

168.   The Advisory Panel was not asked by the FDA to advise, consider, recommend or opine respecting reclassifying ECT devices from Class III to Class II as set forth in the Final Order "for the purpose of treating catatonia or severe major depressive episode ("MDE") associated with major depressive disorder ("MDD") or bipolar disorder ("BPD") in patients age 13 years and older who are treatment-resistant or require a rapid medical response due to the severity of their psychiatric or medical condition."

169.   FDA therefore never received any recommendation from the Panel as

Complaint for Declaratory & Injunctive Relief

to the ultimate issues addressed in the Order, as it was required by law to do, and the public was denied its right to have notice of the panel's recommendation with respect to the ultimate issue in the Final Order.

## IX. RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court,

(1) Declare FDA's Final Order Reclassifying ECT Device Use for Certain Indications (83 Fed. Reg. 66103) unlawful, arbitrary and capricious under 5 U.S.C. §§ 553, 706 and without legal effect;

(2) Prohibit the marketing and sale of Class II or III ECT devices unless such devices are subject to individual FDA-approved premarket applications (PMAs) within two years of the Court's order;

(3) Alternatively, conclude that ECT devices will be subject to Class III controls and limitations until FDA completes a proper reclassification review including relevant double-blind clinical trials and a full and successful PMA submission, and properly evaluates the record evidence;

(4) Retain jurisdiction of this action to ensure compliance with this Court's decree; and

(5) Grant such other and further relief as the court deems just and proper.

## X. TRIAL BY THE COURT WITHOUT A JURY

Pursuant to 28 U.S.C. § 2402, this action shall be tried by the Court without a jury.

DATED: September 16, 2022.

Respectfully submitted,

By: /s/ Peter A. Arhangelsky
Peter A. Arhangelsky (SBN 291325)
EMORD & ASSOCIATES, P.C.

40

2730 S. Val Vista Dr.
Building 6, Suite 133
Gilbert, AZ 85295
Email:  parhangelsky@emord.com
Ph:  (602) 388-8899
*Attorney for Plaintiffs*

Jonathan W. Emord (pending *pro hac vice*)
EMORD & ASSOCIATES, P.C.
11808 Wolf Rune Lane
Clifton, VA 20124
Email: jemord@emord.com
*Attorney for Plaintiffs*

Kendrick Moxon (SBN 128240)
LAW OFFICE OF KENDRICL L. MOXON
3500 West Olive Ave., Ste. 300
Burbank, CA 91505
Tel : (818) 827-7104
Fax : (818) 827-7114
*Attorney for Plaintiffs*

Complaint for Declaratory & Injunctive Relief